# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22 CR 15-2 |
| | ) | |
| v. | ) | Honorable Manish S. Shah |
| | ) | |
| DAVID SARGENT, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT SARGENT'S POST-TRIAL MOTIONS

Christopher T. Grohman
Benesch Friedlander Coplan and Aronoff
71 S. Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: (312) 212-4943
Email:     cgrohman@beneschlaw.com

Carly Chocron
Taft Stettinius & Hollister LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Telephone: (312) 836-4158
Email:     cchocron@taftlaw.com
Counsel for David Sargent

## Table of Contents

I.  Introduction.................................................................................. 1

II.  Factual and Procedural Background ............................................ 2

    a.  The Charges ..................................................................... 2

    b.  The Government's Theory As Presented at Trial ................ 3

    c.  The Evidence Supporting the Government's Theory
       During Its Case-in-Chief ................................................. 4

    d.  The Defense Case.............................................................. 8

III.  Rule 29 and Rule 33 Standards ................................................ 11

IV.  Analysis and Argument.............................................................. 13

    a.  The Court Should Revisit Its Decision on the
       Admission of Co-Conspirator Statements in Light of
       the Trial Evidence, And Evaluate Defendant's Rule 29
       Motion Without Regard to Mr. Klundt's Statements, or
       in the Alternative, Declare a Mistrial Because the
       Admission of the Co-Conspirator Statements Was
       Error ............................................................................. 13

    b.  Even Considering All of the Evidence in the
       Government's Case-In-Chief, No Rational Jury Could
       Convict Sargent Beyond A Reasonable Doubt Based on
       the Government's Purely Circumstantial and
       Speculative Evidence ..................................................... 16

        i.  Given the Above, The Court Should Acquit
           Sargent Pursuant to Fed. R. Crim. P. 29 ................. 26

        ii.  In the Alternative, Given the Manifest Weight of
           the Evidence Favors Sargent, The Court Grant
           a New Trial Pursuant to Fed. R. Crim. P. 33..... **Error!
           Bookmark not defined.**8

    c.  In this Unique Case, Rule 29 Compels the Court to
       Review the Jury's Conflicting Conclusions on the
       Elements of the Crimes Charged Against Each
       Defendant, and Finding them Legally and Logically

Irreconcilable, the Court Must Acquit Sargent, or in the Alternative, Order a New Trial .................................. 30

d.   The Government Improperly Shifted the Burden of Proof and Impermissibly Commented on Sargent's Right to Remain Silent, Requiring a New Trial................. 36

e.   The Government Failed to Prove that the Northern District of Illinois was the Proper Venue for these Charges.......................................................................... 399

V.   Conclusion ...................................................... 40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bourjaily v. United States,*
483 U.S. 171 (1987).................................................................... 13

*Coleman v. Johnson,*
566 U.S. ——, ——, 132 S.Ct. 2060, 182 L.Ed.2d 978 (2012) ................... 18

*Griffin v. California*
(380 U.S. 609 (1965)) ................................................................ 37

*Patterson v. New York,*
432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) .................................. 35

*Piaskowski v. Bett,*
256 F.3d 687 (7th Cir. 2001)..................................................... 15, 18

*United States ex rel. Burke v. Greer,*
756 F.2d 1295 (7th Cir.1985)........................................................ 37

*United States v. Allen,*
383 F.3d 644 (7th Cir. 2004)..................................................... 18, 27

*United States v. Armbruster,*
48 F.4th 527 (7th Cir. 2022) ........................................................ 11

*United States v. Bailin,*
977 F.2d 270 (7th Cir.1992)......................................................... 32

*United States v. Canino,*
949 F.2d 928 (7th Cir.1991), *cert. denied,* 504 U.S. 910, 112
S.Ct. 1940, 118 L.Ed.2d 546 (1992)................................................. 38

*United States v. Conley,*
875 F.3d 391 (7th Cir. 2017)........................................................ 12

*United States v. Davis,*
845 F.3d 282 (7th Cir. 2016)........................................................ 14

*United States v. Dotterweich*,
    320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) ........................................... 31

*United States v. Evans*,
    486 F.3d 315 (7th Cir. 2007) ........................................................... 31, 32, 33

*United States v. Flannery*,
    451 F.2d 880 (1st Cir. 1971) ...................................................................... 37

*United States v. Garcia*,
    919 F.3d 489 (7th Cir. 2019) ........................................................... 15, 16, 17

*United States v. Groves*,
    470 F.3d 311 (7th Cir. 2006) ...................................................................... 18

*United States v. Hatchett*,
    31 F.3d 1411 (1994) ................................................................................... 38

*United States v. Haynie*,
    179 F.3d 1048 (7th Cir. 1999) .............................................................. 13, 14

*United States v. Henning*,
    286 F.3d 914 (6th Cir. 2002) ...................................................................... 12

*United States v. Jones*,
    713 F.3d 336 (7th Cir. 2013) ........................................................... 11, 15, 17

*United States v. Katz*,
    582 F.3d 749 (7th Cir. 2009) ...................................................................... 16

*United States v. Leonard-Allen*,
    739 F.3d 948 (7th Cir. 2013) ...................................................................... 14

*United States v. Lopez*,
    576 F.2d 840 n.1 (10th Cir. 1978) ............................................................. 28

*United States v. Molt*,
    772 F.2d 366 (7th Cir. 1985), *cert. denied,* 475 U.S. 1081, 106
    S.Ct. 1458, 89 L.Ed.2d 715 (1986) ........................................................... 38

*United States v. Moreno*,
    922 F.3d 787 (7th Cir. 2019) ...................................................................... 12

*United States v. Powell*,
469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) ..................................... 29

*United States v. Reed*,
875 F.2d 107 (7th Cir. 1989)......................................................................... 28

*United States v. Salerno*,
108 F.3d 730 (7th Cir.1997).......................................................................... 32

*United States v. Santiago*,
582 F.2d 1128 (7th Cir. 1978)........................................................... 13, 14, 15

*United States v. Solivan*,
937 F.2d 1146 (6th Cir. 1991)....................................................................... 37

*United States v. Tingle*,
183 F.3d 719 (7th Cir. 1999)......................................................................... 39

*United States v. Van Eyl*,
468 F.3d 428 (7th Cir. 2006)......................................................................... 28

*United States v. Williams*,
798 F.2d 1024 (7th Cir. 1986)....................................................................... 16

*Williams v. Lane*,
826 F.2d 654 (7th Cir.1987)......................................................................... 37

## Statutes

15 U.S.C. § 78ff(a) ........................................................................................2

15 U.S.C. § 78j(b) ..........................................................................................2

18 U.S.C. § 371 .............................................................................................2

18 U.S.C. § 1348(1) .......................................................................................2

## Court Rules

Fed. R. Crim Pro. 29 ....................................................................... 1, 8, 25, 26

Fed. R. Crim Pro. 29(c) ................................................................................ 11

Fed. R. Crim Pro. 33 ................................................................................. 1, 27

Fed. R. Crim. Pro. 33(a) ................................................................. 12

Fed. R. Evid. 801(d)(2)(E) ..................................................... 1, 13, 15

Florida. R. 92 ................................................................................ 38

Rule 29 ................................................................................. *passim*

Rule 33 ............................................................................... 11, 39

## Other Authorities

17 C.F.R. § 240.10b-5 ..................................................................... 2

58 AM.JUR.2D NEW TRIAL § 391 (1989) ..................................... 28

Benjamin Franklin, "Letter from Benjamin Franklin to Benjamin Vaughn (Mar. 14, 1785)," *The Works of Benjamin Franklin 11*, ed. John Bigelow (1904), quoted in Alexander Volokh, "n Guilty Men," *University of Pennsylvania Law Review* 146 (1997): 173-216 .................................................................. 29

Defendant DAVID SARGENT, by his attorneys, CHRISTOPHER T. GROHMAN and CARLY CHOCRON, hereby submits his motions pursuant to Fed. R. Crim Pro. 29 and 33 for a post-trial judgment of acquittal, or, in the alternative, a new trial. In support of these motions, Defendant, through counsel, states as follows:

## I.   Introduction

As the old Pearl Bailey saying goes, "It takes two to tango."[1] In this case, the jury disagreed, strangely finding Defendant Klundt not guilty but Defendant Sargent guilty based on a singular theory of the case, the exact same evidence, the exact same charges, and jury instructions that applied the elements of the offenses charged equally to both defendants. While the law favors finality, it also requires this Court to scrutinize the evidence presented, especially in a case such as this, where everyone agrees the only evidence that the government presented was circumstantial, and the case resulted in inconsistent verdicts.

This Motion presents five claims of error: (1) the evidence at trial failed to meet the standard required for the admission of co-conspirator statements under FRE 801(d)(2)(E); (2) no rational jury could make the inferences upon

---

[1] https://en.wikipedia.org/wiki/It_takes_two_to_tango#:~:text=5%20Notes,History,Pearl%20Bailey's%201952%20recording.;
https://dictionary.cambridge.org/us/dictionary/english/it-takes-two-to-tango

inferences required to find Defendant Sargent guilty beyond a reasonable doubt based on the circumstantial evidence presented at trial; (3) issue preclusion prevents Sargent's conviction from standing based on the government's theory of the case, the jury instructions, and the verdict rendered in favor of Klundt; (4) the government's improper comments on Sargent's failure to produce certain evidence unfairly prejudiced Sargent; and, (5) the evidence at trial shows the Northern District of Illinois was an improper venue. Each error requires this Court to either grant a judgment of acquittal on the remaining charges against Sargent or declare a mistrial.

## II. Factual and Procedural Background

### a. The Charges

Defendant David Sargent and his co-defendant, Christopher Klundt, were charged by indictment on January 10, 2022, with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 (Count 1); securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5 (Counts 2-4) and 18 U.S.C. § 1348(1) (Counts 5-7). R. 1. These charges related solely to the government's allegation that on May 1, 2020, Sargent purchased options and stock in Chegg, Inc., a company at which Christopher Klundt was an employee. R. 1. Sargent sold the options on approximately May 5, 2020, and the stock in June 2020, for a total profit of approximately $110,000. R. 1.

Although the government attempted to argue a standard tipper-tippee insider trading theory on Counts 2-4 and a misappropriation-from-Chegg theory on Counts 5-7, this Court found that the misappropriation theory was inadequately pled. R. 93 at 1111-1113. So, essentially, the charges presented to the jury amounted to conspiracy to commit insider trading (Count 1), willfully committing insider trading (Counts 2-4), and committing insider trading (Counts 5-7). R. 80.

b.    <u>The Government's Theory As Presented at Trial</u>

The government's theory on exactly what the material inside information was that Klundt transmitted to Sargent and when exactly it was transmitted was hazy at best. In the indictment, the government noted only that Klundt attended a pre-earnings meeting on May 1, 2020, at which Chegg's First Quarter 2020 earnings were discussed. R. 1 at ¶1(f). Ultimately, the government argued that sometime prior to the evening of April 21, 2020, Sargent and Klundt had a conversation during which Klundt told Sargent the incorrect date of the earnings meeting and also that there would be a pre-earnings meeting on May 1, 2020. R. 94 at 1255, 1283. Under the government's theory, the pair then apparently decided that Sargent would wait to trade in Chegg stock until May 1, 2020 because Klundt would obtain the material inside information during that May 1, 2020 pre-earnings meeting and then transmit it to Sargent via phone after the meeting. R. 94 at 1267-1269, 1285. The

government did not specify exactly what the material inside information that Klundt tipped to Sargent was, although it argued that it was something from the CEO/CFO's April 29, 2020 script that was recorded during the May 1, 2020 meeting. R. 94 at 1272; Gov. Exh. 13 attached hereto as Exh A. Notably, this script is devoid of any mention of "subscriber activity."[2]

     c.   <u>The Evidence Supporting the Government's Theory During Its Case-in-Chief</u>

The government introduced the following evidence during its case-in-chief in an attempt to support its theory of the case:

- An April 21, 2020 text message from Klundt to Sargent that stated: "I misspoke. The earnings call with Wall Street is May 4tg (sic)." R. 87 at 356.

- The fact that at 12:50 p.m. EST on April 21, 2020, Sargent placed a limit trade requesting to purchase 28 shares of Chegg stock worth a total of approximately $985 if the price per share dipped

---

[2] During its closing arguments, the government argued that David Primer's reference to a 200 percent increase in "one of the engagement metrics" in a May 4, 2020 text message with Sargent showed that Klundt had tipped Sargent about this particular figure (R. 94 at. 1272) – apparently, it was the government's theory that this information came from an April 27, 2020 script (Gov. Exh 12 attached hereto as Exh. B) that stated "[i]n just the last two weeks of March new subscribers grew 119% year-over-year" . . . and engagement went up 26%." R. 86 at 234; Exh B. However, there is absolutely zero evidence that Klundt had access to the April 27, 2020 script which was scrapped before the May 1, 2020 meeting. R. 85 at 145-146; R. 86 at 217-218, 233, 236. To the contrary, Chegg representatives testified this script was not sent to Klundt. R. 85 at 146; R. 86 at 217-218, 233. Moreover, 119% and 200% are not the same number. R. 86 at 234-235, 275.

below $35.15 when the stock was currently trading at $36.40, and the order expired at the close of the market that day without being executed; R. 87 at 375-377; R. 88 at 494-496.

- The fact that Sargent talked to Klundt shortly after the May 1, 2020 pre-earnings call for approximately four-and-a-half minutes. R. 87 at 368.

- The fact that Sargent purportedly went "all-in" on Chegg several hours later on May 1, 2020, purchasing approximately $11,000 in Chegg stock and $30,000 in Chegg options ($10,000 at a strike price of $50 and $20,000 at a strike price of $40) (R. 88 at 477, 500-503, 523; R. 89 at 577-578) when the stock was currently trading at $42.36. R. 89 at 597.

- The government's expert's opinion testimony that the mix of options was particularly risky. R. 88 at 554; R. 89 at 614.

- Sargent's income returns, which showed his income for tax year 2018 was $103,838, for tax year 2019 as $129,639, and for tax year 2020 was $229,832. R. 86 at 312-313.

- That Sargent used approximately $8,000 worth of margin to complete his options trades. R. 87 at 438-439.

- A text message from Klundt to Sargent after the earnings call with the emoji, "🤑", to which Sargent responded: "Congratulations on a great quarter! The analysts are swooning 👏." R. 87 at 358-359.

- Klundt's failure to identify that he knew Sargent in response to a lengthy FINRA questionnaire issued to him on or about September 28, 2020.[3] R. 90 at 717-720.

The government does not dispute that the entirety of its evidence is circumstantial. The only direct evidence presented during the government's case-in-chief came from David Primer, who testified:

- Sargent gave Primer $54,000 in 2019 to trade on VIX options. R. 89 at 665.

- Sargent traded airline options and stocks in March 2020 because he believed the airlines would suffer due to the COVID-19 pandemic. R. 89 at 583-584, 669; R. 90 at 705.

- Sargent profited by an additional $6,000 from these airline trades. R. 89 at 584.

---

[3] To the extent that the government argues this is some sort of cover-up, it is notable that there was no contact between Sargent and Klundt anywhere around September 28, 2020, which would be expected if Klundt actually saw Sargent's name on this list and intentionally tried to cover-up his involvement. R. 91 at 901-903.

6

- Sargent and Primer then decided to withdraw $50,000 from this particular trading account because they needed to pause their VIX strategy. R. 89 at 666-667.

- In mid-April 2020 (most likely during a phone call on April 21), Sargent approached Primer and told Primer he wanted to invest in Chegg. R. 89 at 632, 644, 654; R. 90 at 704.

- Sargent had made up his mind in mid-April 2020 that he was in fact going to invest in Chegg. R. 89 at 658.

- It was David Primer's decision, not Sargent's, to wait until May 1, 2020 to trade Chegg stock and options. R. 89 at 637-638, 658, 675.

- Primer chose the various strike prices for the options, not Sargent. R. 89 at 638-639, 675-676.

- Primer was the one who looked at the trading account to determine the amount of money available to trade. R. 89 at 668; R. 90 at 694-695.

- It was Primer who reached out to Sargent on the morning of May 1, 2020 to remind Sargent that they should trade Chegg that day. R. 89 at 637.

- Sargent repeatedly told Primer why he wanted to trade in Chegg – it was an online education company at the start of a national pandemic. R. 89 at 654-655; R. 90 at 696, 701-702.

7

- Sargent did research on Chegg in the form of looking at analyst reports and online sentiment, some of which he forwarded to Primer. R. 89 at 657-658, 674-675; R. 90 at 686

- On May 6, 2020, Sargent traded Chegg puts which had significant downside. R. 90 at 693.

- Around this same time, Sargent and Primer invested in other "COVID-positive" stocks, such as McKesson, Steris, and K-12 education. R. 89 at 672-673; R. 90 at 686-691.

At the conclusion of the government's case-in-chief, both Defendants moved for judgments of acquittal pursuant to Fed. R. Crim. P. 29. R. 90 at 792, 799. This Court took the matters under advisement pursuant to Rule 29(b). R. 90 at 806.

### d.   The Defense Case

Defendant Klundt testified. R. 91 at 830. He testified that on April 20, 2020, he, Sargent, and both their wives had a FaceTime call that lasted over an hour to celebrate Klundt's wife's birthday. R. 91 at 873-874. As Sargent did not have an iPhone, any FaceTime calls would have been through Christina Sargent's phone. R. 93 at 1119-1120. At that time, Klundt was living with his in-laws in Minnesota, having moved there from San Francisco during the pandemic. R. 91 at 871-872. He testified that he may have told Sargent when the earnings call was scheduled but had no specific memory of doing so or the

8

reason for doing so. R. 91 at 875. He denied knowing that Sargent planned to trade in Chegg stock. R. 91 at 880. More importantly, he was unequivocal that he never – either intentionally or by accident – supplied Sargent with material inside information. R. 91 at 883:

> "Q: [D]id you tell Mr. Sargent what you had learned at that May 1st meeting?
>
> A: Absolutely not.
>
> Q: Did you give him information about how Chegg had performed during the first quarter?
>
> A: Definitely not.
>
> Q: Did you tell him, "Chegg stock's gonna jump up. You better buy"?
>
> A: No.
>
> Q: Do you remember exactly what you said during that call?
>
> A: No, I do not.
>
> Q: Then, how, sir, are you so certain you didn't give him this inside information and said, "Hey, go trade. Make some money""?
>
> A: Because I would never do that. I would never do that. I just got off a call with the CEO and CFO who said, "This is what we're going to be talking about. This is very private information. Don't share this information." I wouldn't – it was fresh in my mind. I wouldn't share that information. I – it's not something I did. I didn't do it with Dave. I didn't do it with other friends. I didn't even give that information to my wife or family."

R. 91 at 903-904:

> Q: Mr. Klundt, did you ever give Dave Sargent any inside, confidential information about Chegg?

> A: No, I did not.
>
> Q: Did you ever give anybody inside, confidential information about Chegg?
>
> A: No.
>
> Q: Related to the May 4th earnings call?
>
> A: No.
>
> Q: Ever?
>
> A: No.
>
> Q: Do you have any doubt about that, sir?
>
> A: I have no doubt.

R. 92 at 984:

> Q: Did you ever give inside information to Mr. Sargent, sir?
>
> A: Absolutely not.

Likewise, he testified that he never told Sargent when the pre-earnings call was to occur. R. 91 at 875. Indeed, he did not know when the call was scheduled for until April 22, 2020. R. 87 at 370.

Finally, Klundt testified that his failure to identify Sargent on the September 28, 2020 FINRA form was inadvertent, as he was distracted by a new baby and concerned only with scanning the form for the name of the only person with whom he invested, who was not Sargent. R. 91 at 890-892, 896-900. And, between September 8, 2020 and October 28, 2020, Klundt and Sargent did not have any communication. R. 91 at 901-903.

Sargent's wife, Christina Sargent, also testified to the Sargents' assets – not for the purpose of arguing that "people who have money" do not commit crimes as the government intimated in its closing argument. R. 95 at 1368. The primary purpose of Christina Sargent's testimony was to refute the government's argument that a $40,000 wager on Chegg was a significant investment for Sargent. R. 92 at 990-996; R. 94 at 1260, 1273. Christina Sargent also testified that at the time of the May and June 2020 Chegg trades, Sargent and his family were living in Florida, not Chicago. R. 92 at 999.

Lastly, Klundt called two character witnesses who testified that Klundt was honest and law-abiding. R. 93 at 1209, 1217-1218.

Paradoxically, the jury acquitted Klundt on all charges, acquitted Sargent on the conspiracy charged, but convicted Sargent on the six substantive counts of insider trading. R. 96 at 1390-1391.

## III. Rule 29 and Rule 33 Standards

A judgment of acquittal must be granted when the "evidence is insufficient to sustain a conviction." *United States v. Jones*, 713 F.3d 336, 339–40 (7th Cir. 2013), quoting Fed. R. Crim P. 29(a) & (c). When applying Rule 29, this Court asks whether, viewing the evidence in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 340, quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The

11

Seventh Circuit has sometimes said that this is a high, "nearly insurmountable hurdle." *United States v. Armbruster*, 48 F.4th 527, 531 (7th Cir. 2022), quoting *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017). But it has also observed that "the height of the hurdle depends directly on the strength of the government's evidence." *United States v. Moreno*, 922 F.3d 787, 793 (7th Cir. 2019), quoting *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019). "If the evidence would not allow a civil case to survive a motion for summary judgment or a directed verdict, then the case has no business being given to a jury in a criminal trial." *Id*. "Due to the close relationship between the substantive and conspiracy crimes, which was created by the *Pinkerton* instruction, an automatic consideration of the viability of the substantive convictions should [be] undertaken by the district court when the defendant was acquitted of the conspiracy conviction." *United States v. Henning,* 286 F.3d 914, 920 (6th Cir. 2002).

Pursuant to Fed. R. Crim. P. 33(a), upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. In considering a motion for a new trial, a district judge may assess the credibility of the witnesses and "may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017). "[B]ecause the district court judge is best positioned to make this

determination," the Seventh Circuit's review for abuse of discretion is "highly deferential." *Id.*

## IV. Analysis and Argument

a.  <u>The Court Should Revisit Its Decision on the Admission of Co-Conspirator Statements in Light of the Trial Evidence, And Evaluate Defendant's Rule 29 Motion Without Regard to Mr. Klundt's Statements, or in the Alternative, Declare a Mistrial Because the Admission of the Co-Conspirator Statements Was Error</u>

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In its pretrial filing, the government sought to admit, over Defendants' objections, certain statements of Sargent and Klundt under the Seventh Circuit's procedure pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978). R. 47. The government initially had the burden of proving these elements by a preponderance of the evidence. *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Haynie*, 179 F.3d 1048, 1050 (7th Cir. 1999). The Court, noting Defendants' objection to the circumstantial-only nature of the conspiracy evidence, conditionally admitted the co-conspirator statements. R. 62, 65; R. 97 at 16.

Although the government must submit a *Santiago* proffer before trial to establish the conditional admissibility of an alleged coconspirator statement,

13

the district court must consider the *actual* evidence produced at trial, not the initial proffer, in making the final determination of the admissibility of co-conspirator statements. *See, e.g.*, *Haynie*, 179 F.3d at 1050 (holding that although the district court may conditionally admit co-conspirator statements based on a facially sufficient *Santiago* proffer, "if at the close of its case the prosecution has not met its burden to show that the statements are admissible," the statements must be stricken and/or a mistrial must be declared); *United States v. Davis*, 845 F.3d 282 (7th Cir. 2016).

Here, as the jury concluded, the government presented inadequate evidence to establish that a conspiracy existed. There is simply not enough evidence establishing that Sargent and Klundt had an agreement to commit a crime, even under a preponderance of the evidence standard.

Importantly, when determining whether the statement is admissible under the co-conspirator exception, the district court should take care to "cross the "T"s" and dot the "I"s": that is, ensure that there is proof of an agreement … and that [Defendant's statement] fell within the scope of that agreement." *United States v. Leonard-Allen*, 739 F.3d 948, 955–56 (7th Cir. 2013). As will be discussed further below in Section IV(B), the government presented no direct evidence of a conspiracy. The government relied instead on solely circumstantial evidence. That reliance is important because, although the government may in some cases prove a conspiracy using solely circumstantial

14

evidence, the Seventh Circuit has recently and on multiple occasions instructed district courts to closely scrutinize cases that lack any direct evidence. *United States v. Garcia*, 919 F.3d 489, 503 (7th Cir. 2019) (collecting cases); *Jones*, 713 F.3d at 340; *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001).

There is not a single shred of direct evidence inculpating either Defendant; in fact, the only direct evidence, which took the form of the testimony of government witness David Primer, exculpated Sargent – Primer testified that Sargent was ready to buy Chegg options before he could have had inside information, and Primer dictated the timing of the trade when he advised Sargent to wait until right before the earnings call. R. 89 at 637-638, 658, 675. There is no allegation, at the trial or in the *Santiago* proffer, that Primer is a co-conspirator. Moreover, given that the jury acquitted Klundt on all counts, they must have credited his testimony, during which he completely denied passing any information to Sargent. R. 91 at 883, 903-904. Klundt made no money off the transaction and there is not a piece of evidence indicating that he benefited in any way from the supposed provision of information to Sargent so that Sargent could supposedly trade on that information. R. 91 at 888-889. So even if Klundt did give Sargent information and Sargent traded on it, they are not guilty of *conspiring* to commit a crime, making Klundt's statements inadmissible against Sargent under FRE 801(d)(2)(E).

Once the hearsay statements are excised from the evidence, the Court must evaluate the remaining evidence to determine whether there was sufficient evidence to sustain a conviction without the taint of the inadmissible hearsay. *See United States v. Williams*, 798 F.2d 1024 (7th Cir. 1986). Here, the inadmissible hearsay would include all of Klundt's statements: (1) the text message about the May 4, 2020 earnings call; (2) the email Klundt sent to FINRA about not recognizing anyone on the form; and, (3) the emoji, 🤑. That leaves essentially the fact that Sargent committed the trades in question on the same day as the pre-earnings call and made a large profit. This is hardly proof beyond a reasonable doubt. As such, the Court should grant Sargent's motion to acquit him on Counts 2-7, or in the alternative, order a new trial on those counts without admitting any co-conspirator statements.

> b. <u>Even Considering All of the Evidence in the Government's Case-In-Chief, No Rational Jury Could Convict Sargent Beyond A Reasonable Doubt Based on the Government's Purely Circumstantial and Speculative Evidence</u>

"A jury cannot speculate its way out of reasonable doubt." *United States v. Katz*, 582 F.3d 749, 750 (7th Cir. 2009).

Typically, the government likes to point out that, given the deferential standard, it is quite rare for a Rule 29 motion to be granted. True enough. But that's because the government has an overwhelming amount of evidence in the vast majority of its cases. As the Seventh Circuit exhaustively detailed in

16

*United States v. Garcia*, the granting of a Rule 29 motion is not that rare in cases where the only evidence is circumstantial. 919 F.3d at 496-97 ("the height of the hurdle depends directly on the strength of the government's evidence"); *Jones*, 713 F.3d at 339. Indeed, the "hurdle is lower" when the government's case rests on a string of inferences.

*Garcia* is the Seventh Circuit's capstone case on how to evaluate a Rule 29 motion in a purely circumstantial evidence case and collects and analyzes several previous decisions granting Rule 29 motions, which need not be separately recounted here. In summary, the *Garcia* court held that:

- In ruling on a Rule 29 motion in a circumstantial evidence case, a judge must take special care to guard against the possibility that a defendant might be found guilty by either speculation or mere association. *Id.* at 503. Circumstantial evidence that leads only to a "strong suspicion that someone is involved in a criminal activity is no substitute for proof of guilt beyond a reasonable doubt." *Id.* at 503, citing *Piaskowski v. Bett*, 256 F.3d 687, 692 (7th Cir. 2001). When a case "consists entirely of inferences the government argues may be drawn" from circumstantial evidence the Court must decide "whether this evidence permits an inference beyond a reasonable doubt." *Id.*, citing *Allen*, 383 F.3d at 647.

17

- A Rule 29 motion calls on the court to distinguish between reasonable inferences and speculation. Each step in the inferential chain must be supported by evidence that allows the jury to "draw reasonable inferences from basic facts to ultimate facts." *Coleman v. Johnson,* 566 U.S. ——, ——, 132 S.Ct. 2060, 2064, 182 L.Ed.2d 978 (2012). "Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation." *Piaskowski*, 256 F.3d at 693. "Speculation cannot be the basis for proof in the civil context much less the basis for proof beyond a reasonable doubt." *United States v. Groves,* 470 F.3d 311, 324 (7th Cir. 2006); *see also United States v. Allen*, 383 F.3d 644 (7th Cir. 2004) (reversing 922(g) conviction and stating: "While the district judge's inferences were reasonable, we reversed. The question was not whether a logical set of inferences could show the charge was possibly or even likely true, but whether it could be inferred *beyond a reasonable doubt* that the defendant was guilty as charged.") (emphasis in original).

Applying these principles to Sargent's conviction, the links in the government's chain of inferences (based upon other circumstantial inferences) are not strong enough to survive the scrutiny that this Court must give them.

18

- An April 21, 2020, text message from Klundt to Sargent that stated: "I misspoke. The earnings call with Wall Street is May 4tg (sic)." R. 87 at 356.

There is no dispute that Sargent listened in on the May 4, 2020 earnings meeting. R. 89 at 646. Likewise, there should be no dispute that, based on the testimony of Primer, prior to receiving this text message from Klundt, Sargent had already told Primer that he was going to trade in Chegg stock because he thought it would benefit from the pandemic. R. 89 at 637-638, 654-656. And this was prior to Klundt being in possession of any material inside information. R. 85 at 149-152. As Primer testified, he and Sargent listened in on multiple earnings calls to see the results of their "Covid positive bets." R. 90 at 690-692. This text message is not incriminating and provides no proof that Klundt knew that Sargent even planned to trade on Chegg. Sargent had been following Chegg and Chegg's earnings in the media for years. R. 86 at 238-240; R. 89 at 674-675; R. 91 at 855-857; R. 94 at 1298-1299.

- The fact that at 12:50 p.m. EST on April 21, 2020, Sargent placed a limit trade requesting to purchase 28 shares of Chegg stock worth a total of approximately $985 if the price dipped below $35.15 per share when the stock was currently trading at $36.40, and the order expired at the close of the market that day without being executed; R. 87 at 375-377; R. 88 at 494-496.

19

The government wanted the jury, and now wants the Court, to infer that since Sargent was reluctant to buy Chegg at a $36.40 price on April 21, 2020, yet bought it for $42 on May 1, 2020, the only rational reason for this action is the insider information Klundt gave him on May 1, 2020. R. 94 at 1261-1262. However, this line of reasoning ignores the direct evidence presented. Shortly after Sargent, who had no history of placing limit orders, placed that trade request on April 21, 2020, Primer told him they should wait until May 1, 2020 to trade. R. 87 at 343-344, 378; R. 89 at 637-638, 658. It also ignores the increasingly positive analyst reports on Chegg between April 21 and May 1, which the emails and texts admitted at trial show Sargent read. R. 86 at 271-274; R. 89 at 657-658, 674-675.

- The fact that Sargent talked to Klundt shortly after the May 1, 2020 pre-earnings call for approximately four-and-a-half minutes. R. 87 at 368.

The timing of the call could, when viewed in unreasonable isolation, appear suspicious, but there is simply no evidence of what was discussed on the call. Maybe Sargent was hoping Klundt would generally speak about how well the company was doing? Maybe they were setting up a time to play an online board game? R. 87 at 357-358. A full examination of the phone records admitted into evidence shows that there were regular attempts to and connected calls between Sargent and Klundt from January 2019 and

20

November 2020 and over 500 text messages. R. 87 at 398, 340, 401-402, 409.
Despite all this contact, the government cannot show a single text message
before May 1, 2020 indicating that Klundt either gave Sargent material inside
information or told him that the Chegg pre-earnings call was going to occur on
May 1, 2020.

- The fact that Sargent purportedly went "all-in" on Chegg several
  hours later on May 1, 2020, purchasing approximately $11,000 in
  Chegg stock and $30,000 in Chegg options ($10,000 at a strike
  price of $50 and $20,000 at a strike price of $40) (R. 88 at 477, 500-
  503, 523; R. 89 at 577-578) when the stock was currently trading
  at $42.36. R. 89 at 597.

This argument is utterly unfounded. Sargent did not go "all-in." He
invested $40,000 of his over $300,000 in cash. R. 89 at 581; R. 92 at 996-997.
He had just made $27,500 trading the VIX and shorting United airlines. R. 89
at 583-584, 666. Just months prior, he had invested $54,000 with Primer to
trade on the VIX (R. 88 at 471; R. 89 at 581, 665) and he had previously bought
over $10,000 in "JETS" stock. R. 87 at 437-438. And, Sargent just withdrew
$50,000 from his TradeStation account. R. 89 at 666-667. While a sizeable
trade, it was not out of the ordinary for Sargent during this time period and
the argument that he went "all-in" lacked any evidentiary basis. As such, the
"all in" argument misled the jury.

- The government's expert's opinion testimony that the mix of options was particularly risky. R. 88 at 554; R. 89 at 614.

As Mr. Barrett admitted, he could not determine an accurate break-even point on the trade because he could not value the $50 options prior to expiration. R. 89 at 596-597, 543-545. That said, given that the majority of the options were in the money (R. 88 at 541; R. 89 at 578), and as Mr. Barrett admitted, Chegg routinely had large stock price increases over previous earnings calls, the chance of Sargent losing his entire $40,000 investment was minimal. R. 89 at 593-601; R. 93 at 1140-1145, 1195; Exh. C (Sargent's Demonstrative Exhibit used with Joseph Jinmoon Bernstein). More importantly, the only direct evidence on this point came from Primer, who testified that it was Primer, not Sargent, who picked the strike prices. R. 89 at 675. He personally advised Sargent that this mix of options was not risky. R. 89 at 646 ("We've got a lot of upside without risking too much"). Sargent simply went along with Primer's advice, as Sargent was a novice trader. R. 89 at 639, 669, 676. Sargent made no effort to try to convince Primer to put more of the investment on the out-of-the-money call options. R. 89 at 675-676. Moreover, he doubled down on his investment after the earnings call by buying over $10,000 in put options on May 6, 2020. R. 89 at 604-605. Indeed, it was unlikely that Sargent would lose anywhere near the entirety of his $40,000 investment

should the stock price dip after the earnings call. R. 89 at 593-601; R. 93 at 1140-1145, 1195; Exh. C.

- Sargent's income as reflected on income tax returns for tax year 2018 was $103,838, for tax year 2019 as $129,639, and for tax year 2020 was $229,832. R. 86 at 312-313.

The government's own records showed that Sargent and his wife had over $300,000 in cash on hand at the time he bought Chegg stock, plus seven figures in real estate. R. 92 at 990-994, 996-997. When viewed in the appropriate context, a $10,000 stock purchase and a $30,000 options purchase is not a large investment for the Sargents.

- That Sargent used $8,000 worth of margin to complete his options trades. R. 87 at 438-439.

The government's margin argument is beyond silly. It is uncontroverted from the contemporaneous text messages that it was Primer who conducted this trade and he thought there was enough money in the account to cover the full price of the options ($21,000 in cash plus $11,000 or so in airline stock, which he thought could be used as collateral). R. 89 at 647-48:

Q: Okay. So still at May 4th, let's look at – what did Mr. Sargent text you at about 3:37p.m.?"

A. "We had a margin issue with the JETS position and they're saying additional funds need to be added for compliance, thankfully that extra 20K should hit tomorrow."

23

Q: How did you respond?

A: "That's bizarre. We are long. I don't know what the margin issue could be. I saw they withdrew us from half the position."

Q: What are you explaining to him here?

A: …I thought this was odd because we had purchased this ETF with cash, so we clearly had enough money to support – there's nothing that could have happened to that stock that would leave TradeStation liable for anything. So I thought it was strange that they withdrew anything and called it a margin issue."

It is clear that Primer thought that the account would not have to go on margin because the cash balance plus the value of the JETS stock was above the purchase price of the Chegg options (R. 89 at 647-648) And Sargent had easily deposited $20,000 into TradeStation on May 1, 2020 to cover the balance. R. 89 at 579-580; R. 90 at 695. Indeed, Sargent had just withdrawn $50,000 from that account. R. 88 at 480; R. 89 at 666. If he was truly "all in" on Chegg, he could have wired that money back into the account and bought $80,000 worth of options rather than $30,000. That's what someone who has insider information would have done.

- A text message from Klundt to Sargent after the earnings call with the emoji, "🤑", to which Sargent responded: "Congratulations on a great quarter! The analysts are swooning 👏." R. 87 at 358-359.

A famous lawyer once said, "Never in the history of the American court system has so much weight been placed on an emoji." R. 95 at 1351. The

government asked the jury to infer that Klundt and Sargent, who had been so careful never to text about any insider trading and to only set up meetings on Facetime (with the wives likely present), suddenly decided to celebrate by text once their crime was complete. R. 94 at 1275-1276. This is not a rational inference. The only rational inference is the plain and natural reading of the text messages – Sargent is congratulating Klundt, not vice versa. R. 91 at 854. This is in line with their previous text messages discussing how Klundt's compensation is tied to Chegg's stock price. R. 91 at 855-857.

- Klundt's failure to identify that he knew Sargent in response to a lengthy FINRA questionnaire issued to him on or about September 28, 2020. R. 90 at 717-720.

Particularly given Klundt's acquittal, the only reasonable inference that can properly be drawn from Klundt's failure to identify Sargent is what Klundt testified to – that he read it quickly while distracted by a newborn. R. 91 at 889, 891, 899, 901. Notably, if this omission was part of a cover-up and Klundt in fact realized FINRA was looking into Sargent's trades, one would expect him to alert Sargent of this fact and get on the same page. Yet there is no evidence of a single call, text, email, or radio communication between the two of them between September 8, 2020 and October 28, 2020. R. 91 at 901-903.

25

i. *Given the Above, The Court Should Acquit Sargent Pursuant to Fed. R. Crim. P. 29*

The circumstantial facts adduced at trial supported a finding that Sargent and Klundt were friends (R. 91 at 839, 853); that they started Study Blue (which ultimately was acquired by Chegg) (R. 91 at 839-840, 844-845); that they communicated with each other by phone and by text around the time of Chegg's Q1 2020 earnings announcement (just as they had regularly throughout the Spring of 2020) (R. 87 at 352); that Sargent made trades in Chegg options in May 2020 (R. 88 at 520-521); and that Klundt mistakenly failed to identify Sargent's name on the FINRA list sent in September 2020. R. 90 at 719-720; R. 91 at 899-901. Altogether, the government's circumstantial case amounts to nothing more than a timeline and an emoji.

The direct evidence, on the other hand, favors the defense. It showed that Sargent approached Primer in mid-April 2020 intent on trading on Chegg, an online education company, because he thought it might do well during the pandemic. R. 86 at 270; R. 89 at 644-654, 657-658. Sargent did not wait until May 1, 2020 to execute his trades because he was waiting to get tipped by Klundt, he waited because Primer, his investment advisor, told him to wait. R. 89 at 638, 658.

Often times, the government asks the jury to infer facts from other facts. For example, if a bank robber is wearing a blue ski mask and the police find a

26

blue ski mask in a defendant's home, the government may ask the jury to infer that the defendant is the robber. This case is different because the government asked the jury to not infer facts from other facts, but to infer the existence of elements of the offense. In so doing, the government asked the jury to pile inference upon inference. They ask the jury to infer that (a) Klundt provided inside information to Sargent on the May 1, 2020 phone call; (b) that the inside information was material; and (c) that Klundt knew that Sargent planned to trade based on that information (despite Klundt's testimony otherwise R. 91 at 880). While a jury may make reasonable inferences of fact, any inferences going directly to the elements of the crime must be proved, even inferentially, beyond a reasonable doubt. *Allen*, 383 F.3d at 647 ("It does not prove that Allen *is* the person who was convicted in 1995-unless it can be inferred *beyond a reasonable doubt* that the police arrested the right person. By itself, the fact of the arrest is insufficient to support such an inference to the required degree of certainty.").

Some of the government's inferences are potentially reasonable, but most are not. But, as noted above, each inference the government asked the jury to make has a more plausible innocent explanation. And as to certain crucial elements of the offense – such as whether Klundt knew that Sargent planned to trade in Chegg stock – there is virtually no evidence other than rank speculation. This combined with the fact that the only direct evidence favored

27

Sargent means that no rational jury could conclude that Sargent committed insider trading. This Court should acquit him.

> ### ii. *In the Alternative, Given the Manifest Weight of the Evidence Favors Sargent, The Court Should Grant a New Trial Pursuant to Fed. R. Crim. P. 33*

In the alternative, the Court should grant a new trial because justice so requires. Fed. R. Cr. P. 33.[4] In this case, justice so requires because the verdict was against the manifest weight of the evidence. *See United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *See also United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989) (indicating that a new trial is warranted "where the evidence preponderates so heavily against the defendant that it would be a manifest injustice to let the guilty verdict stand"). In a motion for a new trial, "a court may properly consider the credibility of the witnesses, and may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice. *United States v. Washington*, 184 F.3d 653 (7th Cir. 1999) citing Wright, 3 FED. PRAC. & PROC. CRIM.2D § 553 (1982) and cases cited therein; 58 AM.JUR.2D NEW TRIAL § 391 (1989). Indeed, on a motion for a new trial, the court may reweigh the evidence, taking

---

[4] If the Court grants Sargent's Rule 29 motion, it still must conditionally rule on his new trial motion. See Fed. R. Crim. P. 29(d) ("If a motion for judgment of acquittal after verdict of guilty under this Rule is granted, the court shall also determine whether any motion for a new trial should be granted if the judgment of acquittal is thereafter vacated or reversed, specifying the grounds for such determination.")

into account the credibility of the witnesses. *Id.* In so doing, the judge sits as the thirteenth jury and owes no defense to the original jury's findings or credibility determinations. *United States v. Lopez*, 576 F.2d 840, 845 n.1 (10th Cir. 1978). The district court should evaluate the testimony of both prosecution and defense witnesses. See *United States v. Lewis*, 521 F.App's 530, 431 (6th Cir. 2013). This necessarily includes a testifying defendant.

Here, for the same reasons discussed above, the manifest weight of the evidence favors Sargent. The direct evidence presented in the government's case-in-chief through Primer shows that key elements of the government's theory – namely that Sargent waited until May 1, 2020 to trade because he planned to get insider information that day and that he designed the trades in a risky manner – are not true. According to Primer, Primer picked the trading date and Primer decided the trades. R. 89 at 637-639, 658, 675-676. Moreover, Klundt testified unequivocally that he never gave insider information to Sargent and that he had no idea Sargent planned to trade in Chegg stock. R. 91 at 880, 883, 903-904, 984. Should the Court find these two witnesses credible, it should grant a new trial.

29

c.   In this Unique Case, Rule 29 Compels the Court to Review the
Jury's Conflicting Conclusions on the Elements of the Crimes
Charged Against Each Defendant, and Finding them Legally and
Logically Irreconcilable, the Court Must Acquit Sargent, or in the
Alternative, Order a New Trial

Rightly or wrongly, our Supreme Court favors finality over accuracy or

fairness. *See United States v. Powell,* 469 U.S. 57, 65, 105 S.Ct. 471, 83 L.Ed.2d

461 (1984).[5] That said, while Powell counsels against trying to reconcile

inconsistent verdicts, "it is not a hard and fast rule" and it does not preclude a

Court using Rule 29 to review the jurors' conclusions and see if certain

conclusions on the elements of the crime as to one defendant preclude

conflicting findings as to another defendant. *United States v. Randolph*, 794

F.3d 602, 610–11 (6th Cir. 2015). Where jury verdicts "are marked by such

inconsistency as to indicate arbitrariness or irrationality," courts have opined

that "relief may be warranted." *United States v. Lawrence*, 555 F.3d 254, 263

(6th Cir. 2009). Further, in a situation "where a guilty verdict on one count

necessarily excludes a finding of guilt on another," i.e. a "mutually exclusive"

verdict, a court can review the defendant's challenge to the verdict. *United*

---

[5] Contrast *Powell* with William Blackstones' adage, "Better that ten guilty persons
escape than one innocent suffer," or Benjamin Franklin's thesis, "It is better a
hundred guilty persons should escape than one innocent should suffer." *See* Benjamin
Franklin, "Letter from Benjamin Franklin to Benjamin Vaughn (Mar. 14,
1785)," *The Works of Benjamin Franklin 11*, ed. John Bigelow (1904), quoted in
Alexander Volokh, "n Guilty Men," *University of Pennsylvania Law Review* 146
(1997): 173-216.

*States v. Ruiz*, 386 Fed.Appx. 530, 533 (6th Cir.2010) (citing *Powell*, 469 U.S. at 69, n. 8, 105 S.Ct. 471); see also *United States v. Ashraf*, 628 F.3d 813, 823–24 (6th Cir.2011) (recognizing two exceptions to general rule that inconsistent verdicts are not reviewable); *United States v. Shippley*, 690 F.3d 1192, 1193 (10th Cir.2012) (same); *United States v. Pierce*, 940 F.3d 817 (2d Cir. 2019).

What is unique about this case as compared to *Powell* is that inconsistent verdicts typically come up in situations where: (1) there is a retrial and the inconsistency exists between a jury's conclusion in the first and second trials; or, (2) multiple defendants are charged in the same trial, but under different facts or theories of liability (typically aiding and abetting).

Counsel's research has not found a case that is on all fours with this case – where both defendants are tried jointly, the government argues the same facts and theory as to each defendant, each defendant is charged with the exact same statutory offenses, the elements of each offense charged apply jointly to both defendants, yet the jury reaches different verdicts as to each defendant. *Cf. United States v. Dotterweich,* 320 U.S. 277, 279, 64 S.Ct. 134, 135, 88 L.Ed. 48 (1943). Such a situation as this is a legal and logical impossibility.

The closest case to this situation is *United States v. Evans*, 486 F.3d 315 (7th Cir. 2007), which examined the concept of issue preclusion in subsequent trials of the same defendant. *Evans* was also an insider trading case. In the first trial, the jury acquitted the tipper of conspiracy and the substantive

31

counts, acquitted the tippee (Evans) of conspiracy, and could not reach a verdict on the substantive counts against the tippee. During the second trial, the government changed its theory from a typical tipper-tippee theory to one of corporate misappropriation, under which the government argued that the tippee could have tricked the tipper into divulging material inside information. The second jury convicted the tipper based on this theory. In the second trial, the "district court altered the jury instructions from the first trial" to reflect this change in theory. *Id.* at 320. At the first trial, the jury instructions required the jury to find that the tipper personally benefited from the transaction in order to find both men guilty. *Id.* During the second trial, the judge removed that requirement because the government was proceeding on a misappropriation theory (the same theory that this Court rejected in this case). *Id.*

On appeal, Evans argued that the jury's acquittal of the tipper in the original trial precluded the government from retrying him based on the doctrine of collateral estoppel. The Seventh Circuit "recognized that a narrow version of issue preclusion that may still apply in criminal cases. The defendants have the burden of proving, based on the indictment, evidence, instructions, and verdict, that the jury's acquittals necessarily determined issues which, on retrial, must be proven beyond a reasonable doubt." *Id.*, citing

*United States v. Bailin,* 977 F.2d 270, 280–81 (7th Cir.1992); *see also United States v. Salerno,* 108 F.3d 730, 740–41 (7th Cir.1997).

In *Salerno* and *Bailin,* the Seventh Circuit identified three rules governing the application of issue preclusion in criminal cases: (1) the court cannot engage in hyper-technicality, but rather must examine the pleadings, evidence, charge, and other relevant material to determine whether a rational jury could have based its verdict on a different issue; (2) "issue preclusion only applies when a relevant issue in a subsequent prosecution is an 'ultimate issue,' *i.e.,* an issue that must be proven beyond a reasonable doubt"; (3) the defendant bears the burden of proof in proving that the ultimate issue was "necessarily determined by the prior jury." *Salerno,* 108 F.3d at 741; see *Bailin,* 977 F.2d at 280.

In applying these principles to Evan's case, the Seventh Circuit found that the jury could have concluded that the tipper either did not act with the requisite intent in giving the tippee the information, but that Evans did, or the jury could have found that the tipper did not receive any benefit from giving the information to Evans. Thus, assuming the jury decided the case on those

theories, the government would not be estopped from retrying Evans and pursuing a different theory on retrial based on the doctrine of issue preclusion.[6]

Fair enough, but the first jury would have been estopped from convicting Evans under the tipper-tippee theory as presented in the first trial just as they should be estopped from convicting Sargent here. The upshot of the Evans decision to the present case is that the Seventh Circuit is open to concepts such as issue preclusion being a means by which courts can correct logically irreconcilable verdicts.

In Sargent's case, as this Court instructed, in order to find either defendant guilty, the jury must have found all the elements "insider trading" to be proven beyond a reasonable doubt. R. 80 at 24 (this Court's definition of "insider trading").

For example, if the jury concluded that Klundt did not receive a benefit, as instructed, both men must be found not guilty. Specifically, the Court's instruction stated: "The tipper personally benefitted in some way, directly or

---

[6] Sargent, acknowledging that Seventh Circuit precedent is binding on this Court, would argue that *Evans* was erroneously decided. Given that the jury was instructed only on the tipper-tippee liability theory in the first trial, and the jury instructions did not appear to contain the aiding and abetting liability that the Seventh Circuit hung its hat on, it is hard to see how the requirement that the tipper receive a benefit in order to find the defendant guilty only applies to the tipper and not the tippee, as *Evans* may be read to imply. At least under the tipper-tippee theory (and potentially also the misappropriation theory), the requirement that the tipper receive a benefit in order to find the defendant guilty must apply equally to both defendants.

indirectly, from the disclosure of the material, non-public information." R. 94 at 1245-1246. It didn't say: "In order for the tipper to be found guilty . . ." *See Id*. If any one of these six elements was not proven, both defendants must be found not guilty according to the way the jury was instructed.

More importantly, the Court is required to examine the evidence and the theory actually presented to the jury. The government made one argument and one argument only: Klundt knowingly and intentionally gave Sargent material inside information so he could trade based on it, and Klundt benefited from this tip based on their friendship. R. 94 at 1251, 1282, 1284-1285. The evidence/theory did not show that Sargent somehow cajoled or tricked Klundt into giving him inside information. Indeed, the government argued that this act was premeditated in that Klundt and Sargent planned to talk after the May 1, 2020 pre-earnings call for the express purpose of Klundt then providing Sargent with information that he learned on that call. R. 94 at 1270, 1273, 1290. The government did not present a misappropriation theory to the jury, nor did it plead an aiding-and-abetting liability in the indictment, and such a theory was not contained in the jury instructions. R. 93 at 1111-1112.

Further, Defendant Klundt testified unequivocally that he did not give insider information to Sargent, either intentionally or accidentally. R. 91 at 883, 904. Given the government's theory and Klundt's testimony, there is no

record evidence upon which the jury could have rationally concluded that Klundt acted without the adequate scienter, but Sargent did.

Under the facts of this case, there is no theory or machination under which the jury could acquit Klundt of insider trading yet convict Sargent. Courts are split on the remedy required in a case such as this. *Compare Randolph*, 794 F.3d at 610–11 (defendant must be acquitted under Rule 29) and *Shippley*, 690 F.3d at 1193 (a new trial must be ordered). In this case, since the government pursued a singular theory against both defendants, and the jury's conclusions as to Klundt cannot be reconciled with and its verdict as to Sargent based on the same set of jury instructions, the better course is to acquit Sargent and prevent the government from re-writing history and attempting to pursue a new theory on re-trial in pursuit of a conviction over a just resolution of this case.

   d.   <u>The Government Improperly Shifted the Burden of Proof and Impermissibly Commented on Sargent's Right to Remain Silent, Requiring a New Trial</u>

The burden of proving a defendant guilty beyond a reasonable doubt lies at all times with the government. R. 80 at 4; R. 94 at 1236. The defendant has no obligation to present evidence at all. *Id.*; *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). Despite these bedrock principles, multiple times throughout the trial, the prosecution faulted Defendant for not producing evidence. R. 94 at 1269. For example, during the cross-examination

of Defendant's expert (who was called for the sole purpose of opining on whether the stock trades in question were risky), the government repeatedly asked what evidence the expert saw that Defendant Sargent researched his stock and options trading positions before making them and/or plotted graphs or other such things before executing his trades. R. 93 at 1162-1163. The government doubled down on this line of argument during closing arguments, repeatedly faulting Sargent for failing to produce evidence that he analyzed these trades like a professional before executing them. R. 94 at 1269-1270,

> The Prosecutor: You also heard Mr. Bernstein explain that for those without inside information, trying to make a profit around an earnings announcement requires doing a lot of homework. He explained that investors will look at a variety of factors in deciding what their investment strategy's going to be, to better understand the stock and its environment. He had plots about adjusted earning surprises and earnings surprises and revenue surprises and subscriber growth. And he talked about the Fidelity article that included this chart about volatility.
>
> Investors, those without inside information, they needed to do some sort of analysis to understand the stock –
>
> Mr. Grohman: Objection, burden-shifting.
>
> The Court: Overruled.
>
> Mr. Didwania: These investors, those without inside information, needed to do some sort of analysis to understand the stock and the market and the context. . . . .
>
> David Sargent did none of that analysis."

Defendant properly objected to this burden shifting when the arguments were made. R. 93 at 1162; R. 94 at 1269.

The Seventh Circuit has taken *Griffin v. California* (380 U.S. 609 (1965)) to forbid comment on the defendant's failure to call witnesses, when the only potential witness was the defendant himself. *Williams v. Lane,* 826 F.2d 654, 664–66 (7th Cir.1987); *United States ex rel. Burke v. Greer,* 756 F.2d 1295, 1300–02 (7th Cir.1985). That is the case here. The only person in a position to testify about what research Sargent did prior to buying Chegg stock is Sargent himself. The government's comments on his failure to produce this research is a comment on his failure to testify. *See United States v. Flannery*, 451 F.2d 880, 881-82 (1st Cir. 1971) ("There are many 'facts' which are benign in themselves. The difficulty is that such reference, when only the defendant could have contradicted, clearly calls to the jury's mind the fact that the failed to testify."). This point is especially crucial in a case such as this where the defendant that testified was acquitted yet the defendant that did not testify was convicted on the exact same theory and evidence. Thus, the government's comments constituted prejudicial error. *United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991) ("Because the jury will normally place great confidence in the faithful execution of the obligations of a prosecuting attorney, improper insinuations or suggestions are apt to carry more weight against a defendant than such statements by witnesses.") Based on the prosecution's commentary on Sargent's failure to produce evidence, this Court should vacate the guilty verdicts on counts 2-7 and order a new trial as to those counts.

38

e. <u>The Government Failed to Prove that the Northern District of Illinois was the Proper Venue for these Charges</u>

"Venue is proper in any district where an 'offense was begun, continued, or completed.'" *United States v. Molt,* 772 F.2d 366, 369 (7th Cir. 1985), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 715 (1986) (quoting 18 U.S.C. § 3237(a)). Moreover, "proof of venue 'is not an essential fact constituting the offense charged ... and need only be proved by a preponderance of the evidence.'" *United States v. Hatchett,* 31 F.3d 1411, 1424 (1994) (quoting *United States v. McDonough,* 603 F.2d 19, 22 (7th Cir.1979)); *accord United States v. Canino,* 949 F.2d 928, 942 (7th Cir.1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). This "may include inferences drawn from circumstantial evidence." *Canino,* 949 F.2d at 942.

At trial, however, there was no evidence showing that any part of the offense took place in the Northern District of Illinois. Defendant Klundt lived in the Northern District of California for part of the offense and in the District of Minnesota during the May 1, 2020 trades in question. R. 91 at 830, 871-872, 889. Although he typically resided in the Northern District of Illinois, during the pertinent time periods charged in the indictment, Sargent was living with his in-laws in the Middle District of Florida. R. 92 at 999. All of the actions he allegedly took – namely the Chegg trades – occurred while he was in the Middle District of Florida. R. 92 at 998-999. As such, venue did not lie in the Northern

39

District of Illinois. Thus, a mistrial must be declared, and this case must be dismissed and recharged, if at all, in a proper forum. *United States v. Tingle*, 183 F.3d 719, 726-7 (7th Cir. 1999).

## V.    Conclusion

For the foregoing reasons, the Court should grant Sargent's Rule 29 Motion and acquit him of the remaining charges, or, in the alternative, grant a new trial pursuant to Rule 33.

Dated March 9, 2023                        Respectfully submitted,

/s/ Christopher Grohman
Christopher T. Grohman
cgrohman@beneschlaw.com
Benesch, Friedlander, Coplan & Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
(312) 212-4943

/s/ Carly Chocron
Carly A. Chocron
cchocron@taftlaw.com
Taft Stettinius & Hollister LLP
111 East Wacker, Suite 2600
Chicago, Illinois 60601-4208
(312) 836-4158

*Counsel for David Sargent*